Exchange Commission, et al. Mr. Klingler for the appellant, Mr. Chadwick for the affilies. Good morning. Good morning, Your Honor. May it please the Court, I'm Richard Klingler for the LSTA. The agency has made two basic errors in addressing the statute of limitations that securitizers retain a portion of credit risk. They misconstrued securitizer and they failed to focus retention on credit risk. A securitizer, under the second prong of the definition, is limited to one who sells or transfers an asset to the issuer. The asset manager is the transferee, controls the asset only after the transaction is completed and before the transaction has nothing to sell or to transfer. The manager is the issuer's agent, not a counterparty, and the ordinary usage of the terms support this. If I say to you, my employer would like to buy your house, causing you to sell it, you are the one who transfers title and possession and sells the interest. I'm not the transferor. Likewise, we don't usually speak of a purchaser as a transferor, as the agency's view would have it. Instead, the transfer of possession and title and the sale of the interest are bound together on the other side of the transaction. And it's not a reasonable result that the agencies have reached because managers aren't part of the loan origination problem that Congress sought to address. In fact, they're part of the solution. Congress sought to provide a disincentive for loan originators to use captured SPVs to shift bad loans onto the market. The agent, the asset manager, however, is contrary, is adverse to that dynamic. It has nothing to do with loan origination. In fact, it's paid by the investors to select good loans and to reject bad loans. There's no misalignment of incentives to fix here. And to the extent that regulation is extended to managers, the effect is to require them to tie up capital, to squeeze them from the market, and to cause the cost to efficiency and competition to the agencies themselves, acknowledge and to remove a counterweight to loan origination. In this respect, they're like mutual fund managers, which Congress saw no need to regulate. I was a little puzzled at the way that in responding to the argument that transfer encompasses causal transfer, your response in terms of whether one should use a colloquial or a legalistic set of applications of the word transfer. Are you actually worse off using colloquial terms? And I apologize if we were a bit unfocused in that response. In the context of this statute, which involves an asset transfer to the issuer in the context of structuring a securitization, the natural meaning of the terms, rather than any technical meaning, is entirely sufficient to support our argument. In their definition, frankly, there are plenty of parties who may cause a particular asset transaction, but not all parties who cause it. The transaction may necessarily be called a transfer. Their dictionary definition simply doesn't address who the transfer is. For example, in my example, I approach you on behalf of my employer causing you to transfer. You could sell your house for any reason. It may be that your kids have left. It could be that your financial advisor advises you to. All of those parties may cause the sale in some colloquial sense, but we wouldn't call them a transfer. In the commission's approach, or the interagency agency's group, who is the issuer in part A of the securitizer definition? In the first prong, well, there's an issuer in both prong one and prong two. We believe, and the agencies agree, that in prong two it's clearly the issuing entity. We also believe that it's the issuing entity in prong one as well. And the Exchange Act definition, the first portion of the Exchange Act definition, indicates that the issuer is the party that issues the securities, which would make it the issuing entity. Okay, so and in B, which ends with to the issuer, that's back to the issuing entity. That's right, to the special purpose vehicle. And that's the agency's view of that as well. But the agency's view doesn't make I actually couldn't find in the agency's presentation what they thought of in A, but okay. It's not a dispute. Well, no, there is a dispute about prong one. In prong two, there's no dispute that the transfer of the asset is to the issuing entity, to the SPV. Right. Because the manager's obligation turns on the fact that it selects, under the agency's rationale, that it selects the loans purchased by the SPV. What do you make of indirectly in here? Why isn't that sufficient to support the agency's view that when you direct the purchase, you are indirectly transferring or so on? Right. Well, as Honeycutt recently reminds us, Congress's use of indirectly or directly doesn't change the nature of transfer. And it's clear that, yes, it doesn't change the nature of the word transfer. And it's clear that indirectly here does independent meaning or does independent work and has meaning to ensure that where there is an intermediary involved, as there is in most securitizations but not for CLOs, that there may be a direct sale to the issuer, but the indirect sale or transfer may be the party that actually initially holds the loan and directs the transaction. There's nothing about indirectly that takes transfer out of the context of a securitization structuring where there's a property interest that is being transferred or sold to the issuer. Can you give me a specific example of indirect? I'm not sure I followed what you said there. So for many securitizations, well, let me give you two examples. For many securitizations, there's an intermediary, particularly in the context of real property interest. Between who? Between the party that originally holds the loan, probably originated the loan, may have originated the loan, passes it to the depositor, in that case the intermediary, who actually sells it to the issuer. So that would be the kind of indirect transaction that Congress described. And, in fact, they use the term including by an affiliate. Sometimes that intermediary may be affiliate and sometimes it's not. Another example might be if a parent company and a subsidiary are involved, the subsidiary may actually hold the asset and may be the one that actually sells the interest or transfers possession and title. But if it's a controlled subsidiary, it's the parent that may be indirectly doing the transfer or sale. And if I could also just note that transfer and sale, Congress, as with indirectly and directly, is Congress is trying to capture all the interest involved. We normally speak of the transfer of title and possession and sale of an interest. So the natural meaning of the terms, Congress is simply capturing all of the portions of the transaction, the elements of the transfer to the issuer and making sure that it does that. Another portion to the statute also attacks on the phrase conveyance, which is usually associated with a real property interest. The agencies seem to be concerned, and they say so in part, that if you're correct here, then other types of issuers may be able to restructure along the same lines as you are and avoid what was more clearly the intended credit risk retention purpose of the statute. Right. I also didn't understand them to me making that argument with respect to CLO managers. And they certainly have, all the agencies have, a whole range of anti-avoidance mechanisms. So to the extent that the concern is that an entity that actually originates loans somehow gets a straw manager, and there's an evasion process taking place, then the agencies have the ability to do that, and the statutory terms capture that. The party that has the loans and would be using the manager in that way would itself be the party that's transferring or selling assets to the issuing entity. If I understand your argument, your view is that the agencies could clearly cover the CLO, right, as an issuer. Well. No? Did I get that wrong? We think that the statute clearly indicates that. Yeah. But the agencies didn't reach that conclusion. Well, but your argument encompasses the proposition that they could. That's absolutely right. The Congress provided a mechanism by which all securitizations would be captured. If you simply read issue in prong one is issuing entity, every securitization has an issuing entity. So there was no need to expand a stretch transfer unnaturally or stretch prong two to cover the waterfront. Would the adverse economic consequences of 2.2 follow completely from as completely from that as from what the agencies did? I don't believe so, Your Honor. I mean, all of this is hypothetical because the agencies candidly admit they gave prong one no independent effect. So in further proceedings, they may tee up the policy issues. But I don't think it does for the following reason. The manager is not the regulated party under prong one. It's the issuer. And by passing on risk to the issuer, as the agencies indicate, you're effectively passing it on to the equity holders, and we would say not passing it on to the manager. Unlike the manager, which has no business based on balance sheet investing or taking positions, equity holders, by definition, are doing that. They are in the business of taking and holding interest. So there's no disincentives from that point of view. They're also a more logical party because it's actually the equity holders who drive the transaction and set very detailed investment parameters that the manager executes. Am I correct in thinking that you sought but were denied an exemption? That's right. We had a whole set of alternatives that we tried to put in front of the agencies. As soon as there was a suggestion in the initial order in note 42 that CLO managers might be captured, we started a series of letters. The first one both said that the statutory language doesn't encompass us, and to the extent you find that it does, for all the reasons of the structural protections and the adversity of CLOs, open market CLOs, to core origination, we should have an exemption. Did you separately seek review of the denial of the exemption, or is that not a separate order? It's not a separate order. In fact, most of the cost-benefit analysis that the agencies undertook addresses why there shouldn't be a complete exemption. They give very little attention to why our other alternatives weren't addressed. If I could turn to credit risk for just a second. The agencies should have narrowed the horizontal component of their rule to focus on an adequate level of credit risk based on their own reasoning and conclusions. The agencies concluded that retaining 5% of credit risk was sufficient to align securitizer and investor interests and to meet the statutory objectives of the statute. They also concluded that retaining more than 5% credit risk would result in the managers tying up too much capital, being squeezed from the market, and incurring costs of efficiency, harm to capital formation, and competition. They didn't say too much. They just said more. Pardon? More capital, but not too much. They didn't say too much. They would tie up more capital. They would tie up more capital. The agencies didn't say it would tie up too much. Well, they did in the sense of they expressly struck a balance in the 5% benchmark. They said amounts below that amount would be insufficient to align the securitizer and investor interest, but amounts above that much would incur the harms to competition and efficiency. Right, and they thought that wasn't too much. It was worth it. Well, when they came to their cost-benefit analysis, they said it was worth it for a very poor reason. The only reason that they gave in rejecting the alternatives that would have had the securitizer clearly retain 5% of credit risk was that the securitizers would not be retaining an interest that was 5% of fair value, economic value. Well, the concern was also, pardon not the concern, they drew on their authority to require more than 5%. That's a minimum in the statute. Well, they also invoked issues of transparency and measurement. Right, there's no, well, they did not with respect to CLOs for good reason. Well, I'm sorry. For transparency, they did not. For measurement, they did. Transparency, there's no issues for CLOs. It's an absolutely transparent disclosure to the investment. For the benefits of fair value, however, they did refer to the ability to compare and the industry or the market understanding of that. They did not, however, use that as a reason not to focus the horizontal component on the amount of credit risk. And let me focus on an example that illustrates this. The Structured Finance Industry Group urged the agencies to focus the horizontal component on credit risk. They proposed that the agencies do that by having securitizers retain 1% of the securitization value in a horizontal form measured by fair value. At the bottom tranche? Yes, sorry, I was using in the bottom tranche. With the result, then, because it's the bottom tranche, that the securitizer would retain roughly 10% of the transaction's credit risk and would have a capital outlay of only 20% of what the rule would have otherwise required. And other of the proposals were designed to do the same thing. But what that shows is that there's nothing magical or special about fair value. The agencies still could have used their fair value determination, but had they just focused on credit risk, they would have avoided all of the harms that they themselves identified. I guess, isn't the proposition that a 10% of the lowest tranche, I'm sorry, no, 2% of the lowest tranche would encompass 10% of the credit risk, isn't that a highly fact-intensive proposition? Well, the agencies have never disputed that credit risk is highly concentrated in the subordinate tranche. We had an expert that calculated and provided the basis for indicating how much the equity component of securitization reflects in terms of credit risk. And the SFIG, the Structured Finance Industry Group, in setting the amount at 1%, doubled the amount that the agencies indicated was reasonable. Now, the agencies, however, they never undertook, they certainly never contested that, but they also never undertook their own examination of how much credit risk was embodied in their proposal, or how much credit risk would have been embodied in the SFIG proposal. They simply never examined the issue, that they didn't focus on the statutory factor in reaching their determination, contrary to Michigan, the EPA, and State Farm. The inconsistency in their decision-making between indicating that 5% of credit risk was sufficient to meet the statutory objectives and then dismissing the alternatives based on insufficient economic value was an inconsistency that's contrary to State Farm. The measurement of costs and benefits and not selecting the most pro-competitive and pro-efficiency rule that would have met the statutory benchmark under their own reasoning is particularly a problem for the Commission, which has a statutory obligation to do exactly that. And the agencies never explained, they were urged to focus the horizontal component on credit risk, and there's nowhere in the order that indicates why they didn't do that. They were also presented with a set of alternatives that would have accomplished that result, and the only discussion that they give of those alternatives that would have had the security to purchase equity to assure the world's investors that it had 5% of credit risk was dismissed in two sentences. And one of those sentences was, this is insufficient because it doesn't have sufficient economic risk. The basic cost-benefit analysis turned on an acknowledgment of the very significant costs that the rule would impose and indicated that those costs were acceptable because otherwise there would be insufficient alignment of interest between the securitizer and investors. But here, the benchmark that the agencies themselves and that clearly the statute indicates is the appropriate mechanism for alignment is the quantum of credit risk, not the quantum of economic value. And this is particularly important in the context of seeing whether there's sufficient alignment of interest. The agencies never identified any gap or any failure of alignment of interest between the CLO manager and the investors. As we said in the context of the securitization issue, the CLO manager is entirely aligned, is rewarded only for delivering results to the investor. It does that by ensuring that there is good origination rather than bad origination. There's no problem to fix. And that's particularly the case once the securitizer demonstrates to the agency and to the world that it's retaining 5% or more of the credit risk, which is what the agencies themselves concluded was a sufficient amount to align interest. Before we lose the opportunity, I want to go back to where we started with looking at the statute again. With the issuer in Part A being the CLO, basically, who is the issuer in Part B as you see it? The originating bank? No, no, the issuer in Part B is also the issuing entity. Because the transfer of the asset has to be to the issuer of the CLO notes. And I think the agencies agree with the point on that. I'm sorry, Hunter. Go ahead. If I could make one other point about credit risk. The agency's principal argument, other than there's something special about fair value, was that it was enough to offer up the vertical option alone. And for that, the agency's own order really indicates quite the contrary. The order concluded that both the horizontal and the vertical had to be offered and that not to offer the horizontal would have incurred costs to competition and efficiency in light of market dynamics that required certain parties to hold in the horizontal form. The vertical choice also isn't the relevant choice for purposes of what the issue before the agencies was and the issue that we're challenging. Because in the question of choosing vertical versus horizontal, what was requested was a way to be able to hold a horizontal interest with much less capital outlay, one-fifth, one-ninth as much under the different alternatives, and still meet the requirements for alignment of interest and adequate risk retention that the agencies themselves concluded was the appropriate amount. Nothing about providing a choice between horizontal and vertical would have enabled the agencies to escape the API obligations regarding consistent decision-making, focusing on the statutory factor of credit risk, implementing the cost-benefit analysis and the conclusions and articulating the basis for why they declined to narrow the horizontal component and reject the alternatives. You said that the agency failed to meet its obligation to adopt the most pro-competitive and efficient document. But you're drawing on the four factors in the 96th Amendment, is that right? Well, this would be Section 23A2 of the Exchange Act, and particularly the sentence that... Is that the one that lists the four factors, the effect on capital formation and so on? No, that's... I believe that's Section... Well, let's go to the one... I'm sorry. There's one that you need to consider the four factors, and there's another that says that... Actually, let me just turn to this rather than wasting your time on this. So Section 23A2... Section 3F of the Act is the four factors. The agencies must consider efficiency, competition, capital formation, and so on. Section 23A2 includes the sentence that the Commission... Again, it's not all the agencies, just the Commission... shall not adopt any such rule or regulation which would impose a burden on competition not necessary or appropriate in furtherance of the purposes of this chapter. And this is a very unusual case in that usually the 3F is more important because the agency needs to demonstrate that it turns its mind to the issue and has the... basically the flexibility of achieving a range of countervailing statutory objectives. Here, however, this 23A2 provision is triggered because the Commission itself concluded that the statutory objectives were met by retention of 5% of credit risk. So once it concluded that 5% retention of credit risk was sufficient, it did have an obligation to craft or to adopt only a rule that would be the most pro-competitive and most pro-efficiency that met that objective. And by ensuring... by declining to tailor the horizontal component, in other words, to have securitizers tie up capital with 5% of the securitization, $25 million out of a $500 million securitization, rather than tie up $3 million or $5 million as the ESPY proposal would have done, they were adopting a rule that wasn't the most efficient and wasn't the most pro-competitive because they themselves indicated that if you tie up additional capital, that's what creates the inefficiency for those who remain and squeezes out managers who either may have difficulty raising the money or may choose simply to manage a different type of asset that doesn't have the risk retention obligations. Why don't we hear from the government? We'll give you a few minutes on rebuttal. Thank you very much, Your Honor. Good morning. May it please the Court, Joshua Chadwick for the Federal Reserve Board and the Securities and Exchange Commission. I'd like to make three points this morning. First, that LSTA's unduly narrow reading of the statute's securitizer definition would substantially undermine Congress's risk retention mandate. Second, that the agencies were tasked with promulgating a workable rule for all asset-backed securitizations, not just CLOs. And the fact that certain CLO managers find one of the options presented by the agencies to be too conservative does not render that approach arbitrary. Does it have to be the same for all of the different insurance types? It does not have to be the same, Your Honor, but there's obviously a need for a workable rule. These are regulating asset-backed securitization structures that can be collateralized with any number of things. CLOs just happen to be one small component. Do you have representatives of any other type of issuance sought review? No, this is only CLOs, Your Honor. So there's one rule versus two. Well, the agencies, I will take a second to point out, Your Honor, the agencies did give careful consideration to the CLO issuer comments and did provide a separate lead arranger option for CLOs. There's also a separate component of the rule that relates to underwriting standards for commercial loans that would be exempt from risk retention at all. And the agencies carefully considered the exemption request that the CLO managers put in. So the only case that's challenged the rule is from CLOs. But there's lots of comments from other parts of the jurisdiction. Any other types of SFS securities, backed securities, actively managed? Actively managed in a pool of assets. Well, certainly they could be. There's nothing stopping an actively managed asset pool. I believe that there are other securitizations. One's not coming to mind at this moment. On the statute, subsection A and issuer, does that encompass CLOs? Well, so the term issuer does appear in both prongs of the statute. As the agencies read those two prongs of the definition, they certainly determined in the second prong that the issuer was the entity that was issuing securities. In the U.S. securitization market, that's invariably a special purpose vehicle that the sponsor of securitization creates purely for bankruptcy remoteness purposes to facilitate the transaction. So as to the first prong, the agencies – well, let me say something about the second prong. The language of that second prong was adopted virtually word-for-word by Congress from the Commission's Reg AB, which would already crystallize the concept of sponsor. The regulation wouldn't have covered the managers, however, correct? That's correct, Your Honor, but only because the regulation's definition of asset-backed security excluded managed pool assets. When Congress modified the Exchange Act for the purposes of Dodd-Frank and for this rule requirement, they provided a different definition of asset-backed securities, and it provides a list, one of which includes CDOs, which CLOs are clearly a subset of. So there's no question that when Congress modified the asset-backed security definition in the Exchange Act that they were clearly intending to contemplate. Let's get back to A because my question was about A. Yes, Your Honor. So the agencies took a cue from another set of Exchange Act regulations which defined issuer to mean depositor, which is oftentimes an entity that's actually making the deposit of collateral in certain securitization structures. But agencies also determined that the second prong of the definition, that sponsor definition, would cover every asset-backed securitization that's currently in existence in the United States securitization market. So it is the case that every securitization would be covered by the second prong. So what work? I guess I'm still not understanding that. Two things. What does issuer mean in A? And I think you're saying it doesn't encompass CLO. And then the second thing is if B covers everything, what was the purpose of that? Well, that is a question, Your Honor, and I think that the best answer to that is that Congress was providing maximum flexibility to the agencies to ensure that all asset-backed securitizations were covered. It happens to be that in the current securitization market that these special purpose vehicles are invariably used. But that's not to say that there aren't other possible structures. In other countries there are securitization structures in which the assets are kept on the balance sheets of the entities. So it is possible, and that doesn't occur in the United States because of the bankruptcy regime, but it is possible for that issuer prong to do separate work. It happens that the agencies didn't need it. It's just odd, it seems to me, and you know where I'm coming from, where to look at this statute and say issuer means one thing in A and a different thing in B. It's not impossible. There are statutes that have that kind of structure, not usually so closely put together. One thing in B and nothing in A. Yeah, well, that is different. One thing in B and nothing in A, but those are different in different meanings. It is true that they're used slightly differently in the two prongs, and that is something that the agencies had to reconcile in promulgating the rule. Well, the question is whether it's true that they're slightly different in the two prongs, right? The agencies read it that way. So the agencies could have read the first prong to mean the special purpose vehicle. I think the agencies could have read it that way, but the reality of the situation is that that would be a regulatory nullity. That would accomplish nothing. The special purpose vehicles cannot independently retain risk of the investors. It's simply a robot. It's a machine by which the investors put in money. It retranches that money when it invests the money, and then retranches the risk of the loans it invests in to varying risk-reward ratios for the investors. But at the end of the day, the SQD is not an ongoing entity. Well, if the rule applied to it, it would become an ongoing entity, would it not? No, I don't think so, Your Honor. It would still ultimately be. If it has to retain, and literally the word retain seems to apply, then there it is holding this asset. Well, the SPV retains assets throughout the life of the securitization, which is many years, maybe a decade on average. So at some point, whatever investment that's gone into the SPV passes back to the investors in the form of principal and interest payments. So at the end of the day, whatever risk or reward is in that SPV ultimately finds its way to one of the classes of investors in the securitization. I still don't understand why it couldn't hold the retained asset value or risk-computed asset value for a long enough period to satisfy Congress's stated goals. Well. You said they normally don't. Well, of course they normally don't. Well, I think that there's value that's held in the SPV throughout the course of the securitization. The loans are held there such that they're sufficient collateral to pay the principal and interest payments to the investors. But in the end, if the losses begin to mount in the loans that are collateralizing the structure, that ultimately it's not the SPV that's going to suffer, it's the investors in the securitization. Right, but they suffer as a result of the risk associated with these assets, right, which I thought was supposed to be the congressional concern. Well, I think the congressional concern, Your Honor, is with skin in the game. And the only way you can have skin in the game is by investing in the securitization structure. Congress wanted the originators or the sponsors of the securitizations to – I mean, that's the term that Congress repeatedly used, certainly in legislative history, was to have skin in the game. And the SPV can't have skin in the game. Yeah, but the parties that own it do, right? Well, those are the investors, Your Honor. Those are the very parties that the statute's designed to protect, not just for their own interests but for the financial stability of the entire financial system. So they're the protected party. They can't hold this. Okay, okay, I got you. I thought you were told by the industry that because for market purposes, just market forces as it were, they do sometimes hold a piece of the bottom tranche all the way to the end. They do sometimes hold a piece of the bottom tranche, but that's precisely what the horizontal retention option that the agencies – I understand that, but I thought you were just saying to Judge Williams that that's not possible. Well, it's the equity holders or that class of investor that's holding that residual interest in the securitization structure. My understanding from the industry was that the party holding that piece of the bottom tranche is indeed the manager. I apologize, Your Honor. Yes, that is correct. Oftentimes the investors and the securities demand that the CO managers do precisely what the agencies have required them to do to the horizontal risk retention option, which is to hold a piece of that first loss position. So I guess you're saying it's not the SPV itself. It's not the SPV. It is the manager. Okay. The idea that this is somehow a foreign concept and the manager is not an appropriate risk retention candidate, well, that's belied by the very market practices that existed prior to this rule. Clearly the investors think there's value in the manager. When the manager does retain some of the bottom tranche prior to this rule, is the rule operating right now? It is, Your Honor, since Christmas Eve of 2016. Okay. So before that, what proportion were the managers typically, if they withheld any, how much were they holding? The LSTA said in their summary judgment briefing in the court below, Your Honor, that up to approximately 1%. So the amount that they say also would give you 5% of the credit risk? Well, right. Actually, they say a lesser amount, Your Honor. They say that 1% would be double. What they've advocated for the agencies in this court is a half percent. 0.56%? Right. Which is less than what the market was demanding prior to the rule, which would seem to be an unusual result. How do the CLO managers sell or transfer assets to the issuer, to the CLO? I mean, that's the key point they're making is that this statutory language doesn't fit this situation. Well, I think that the language does fit, Your Honor, because the CLO manager is driving this train. The CLO manager is causing the assets to be transferred. The CLO manager selects the assets and then directs this ministerial special purpose vehicle, which if the manager itself You call something to be transferred by purchasing it, but you wouldn't normally say that's The SPV is purchasing it as a technical matter, but it's only doing so at this express direction of the CLO manager. The CLO manager is an agent of the CLO. Well, it is true that in a technical sense, the CLO manager is acting as an agent of the SPV because that's the way the formational documents are structured. But as a practical sense, the CLO manager is putting this securitization together. It's gathering investors. The CLO manager is packaging the securities, which is what Congress talked about, those who package assets and securities and pass them into the market. Those are the people that are required to retain risk. So is that the same as a sponsor and later advisor to a mutual fund? I'm sorry, I'm not sure I understand. Is it the functions you're describing, in other words, the same functions? Are they not the same functions that the sponsor of a mutual fund would undertake? I do think that they're similar, Your Honor. You rely on a dictionary definition of transfer as encompassing causal transfer. Do you have any sentence, if you have found any sentence written in the real world in which transfer is used to encompass something like parallel to the role of the managers here? I mean, you invoked actually something about deflecting a remainderment, deflecting a transfer for tax purposes. Even in that context, you didn't actually offer a sentence that anyone used in the sense of calling it the remainderment making a transfer or transferring. So I just wondered. It's one thing to have dictionary language that can be read as encompassing a particular usage, but if it's never actually used that way, that suggests we're sort of on the extreme edge of potential meanings for the words. Well, I guess you can talk about this in a colloquial sense, Your Honor. You can talk about it in the very neurotechnical sense. I can't see that that made much difference. I'm sorry. Go ahead, either. You don't think that that makes a lot of difference? Well, I didn't find it. I mean, it seemed to me, as a practical matter, one has to sort of face it in both terms. Well, I don't think it's an ordinary sentence. I mean, things get transferred. Could you ask a hostess to transfer your check from a bartender to your waiter to cause the pass from one to another? I think that's a binary sentence. In other words, using an intermediary. That would seem to me the classic instance of using transfer to encompass the proposition of cause of transfer. But this sort of situation seems quite different. Let me just say this, Your Honor, and this is an important point. If you accept their reading of transfer, it would drive a freight train through what Congress intended to do because some of the structures that Congress was adamant both not just in the legislative history, but in the text of the statute, it covered some of the most dangerous toxic assets of the financial crisis, such as CDO squared, which is an asset-backed security that itself is composed of asset-backed securities. Those are the same management structure where they're purchasing on the open market, causing them to be transferred into a securitization vehicle. And if you adopt their very narrow reading of transfer, then those sorts of securitizations would be uncovered, and there would not be a way for the agency to fix that problem. But even under their interpretation, correct me if I'm wrong, the statute still has a lot of impact on other types of transactions. It's not rendered meaningless. Well, Your Honor, let me say this. There would be some transactions that were left, balance sheet transactions were, but agencies also observed that once you take this other view of transfer, then now you can structure around that because if you've got bad assets, you've got risky assets on your balance sheet, all you have to do is find a third-party asset manager and say, why don't you take these assets, go find some other assets out there, organize and initiate an asset-backed securities transaction, and sell this stuff out into the market. And that sort of structuring and evasion would still be there, and the market may adjust in that way. But then we still have to stick with the language, as you know, and it's just odd to pick up on Judge Williams' point to say that the purchaser's agent is transferring the assets to the purchaser, which is your... Well, I think you could think of examples in which a buyer's agent used the term transfer, but I also think that this statute read in the context of what Congress was clearly attempting to do necessitates... And what you're, under Congress, clearly attempting to do, your best evidence of that is? To cover all... Apart from the text. Well, the text of the statute, I think, is clear that Congress wants to cover all asset-backed securities transactions,  Why didn't it just stop with, in subsection B, a person who organizes and initiates an asset-backed securities transaction? Well, I think the easiest answer to that is because it decided to adopt the definition that the Commission had already promulgated in Reg AB. But then Reg AB, and this is what I... You explained this to me, would not have covered a person... Because there's a different definition of asset-backed security in Reg AB, Congress chose not to adopt that definition of asset-backed security. It chose to write its own definition of asset-backed security, which clearly covers... But that suggests that Congress just screwed up in borrowing a regulation and then changing part of it, and then, in your view, left a gap. Well, you could view it as a gap. The agencies had a task to do to ensure that the securitizations were covered, John. The agencies had to make this best sense of what Congress did, as they possibly could. But you... Let me just make sure I have it correct. They borrowed from the regulation. The regulation would not cover... Reg AB, the definition of asset-backed security in Reg AB does not cover managed legal assets like CLOs, but... Did anyone point that out at the time? Well... We're borrowing this regulation, but it won't cover, in your words, something that we're clearly intending to... Well, I think it's the concept of a sponsor that they were borrowing, your Honor. They had their own... Congress had its own definition of asset-backed security in mind. What it wanted to capture was the idea of a sponsor, the idea that every asset-backed securitization has someone who is sponsoring it, not a... And an SPV isn't sponsoring it, right? There's either an originator or a manager. Someone's either originating assets or collecting assets. The sponsor's being the manager for current purposes. Correct, your Honor. But the manager was not a sponsor under the regulation. Well, only for the narrow... just for CLOs, because CLOs are other managed legal assets. But there are many other securitization structures for which the sponsor definition would have captured them. Okay. Do you want to speak to the other issue? Well, yes, your Honor. As to the second issue, LSTA has claimed that the horizontal risk retention option is arbitrary and capricious merely because it is, quote, non-uniform with the vertical risk retention option. But this argument has no basis in the law. Congress's statutory requirement was not less than 5% risk retention, absent a statutory or agency exemption. There's no question that agencies achieve that for all asset-backed securitizations, regardless of the type or quality of the underlying assets. It's also not disputed that the vertical risk retention option, which agencies provided, provides precisely 5% of the credit risk retention for a pro rata holding. So the only question is whether offering an additional horizontal retention option, which provided additional flexibility to securitizers, was arbitrary and capricious because it does not necessarily align with the vertical risk retention option. But you're skipping the analytical process, right, of determining that this is an optimal tradeoff between the different values under consideration, with the 5% credit risk being a wall. Well, Congress made the policy decision of 5% or more. The agencies were not able, did not have sufficient data, or were not able to say precisely the amount of retained credit risk. They had to rely on Congress's policy judgment that it's got to get to 5%. Yeah, nobody's disputing that. The question is why should they pick two techniques which involve much more holding of value than is necessary to meet the 5% or perhaps 10% of the credit risk? Well, that's according to a model that LSTA's expert put together that would undertake to take historical performance of loans and to make assumptions about future economic conditions and say, gosh, all of the credit risk is down at the bottom. It's all there. Never mind. I thought that was baked in, right? We call it the lowest tranche because it's the highest risk tranche, right? Well, that is definitely true, Your Honor. It is the riskiest. I mean, that's the very purpose of the securitization structure is to push risk down. But risk exists throughout the securitization structure. Right. What's the experience on that? In terms of CLOs, Your Honor? Yeah. Well, CLOs performed quite well during the financial crisis, Your Honor, and the agencies recognized that. The agencies also— Was there ever any loss in any issuance that exceeded the equity at the bottom? If there were, there were not many, Your Honor. Frankly. But the agencies examined that and determined that many of the government interventions that occurred during the financial crisis may have precluded what could have been losses that were to show themselves in CLO market. Agencies also determined that there's a level of froth in the leveraged lending CLO markets as investors search for yield that has caused underwriting standards to drop in the leveraged lending CLO markets. So agencies were concerned that—and this is consistent with the purpose of the rule— that this could be a future problem area in terms of financial stability. So the agencies were very—considered that quite careful. Okay. Anything else? Thank you very much. Thank you. Thank you, Your Honors. Three quick points on the securitization definition. One, the loophole argument and the train driving through a loophole only arises because the agencies gave absolutely no independent meaning to the first prong. If they simply read issuer in the first prong as issuing entity, they could reach whatever securitization with whatever authorized regulations that they want. Yeah. So who holds the SPV? So the SPV is an entity. It holds the loan. I understand that. And then the note holders have various claims on the income or the return of income and principal from those loans. The residual holding, the amount that is left over at the end of the day, is held by the lowest prongs, the equity holders. So to the extent that there is an obligation imposed on the issuer, as even in the agency's own brief set, it's the equity note holders who end up bearing that residual risk. So a risk retention obligation imposed on them indicates how much of the risk needs to be allocated to them, and it requires that the equity holders not divest themselves of that risk. As to your question, Judge Ginsburg, about different rules for the CLO, that the statute, Congress clearly intended that there be different rules for different classes of assets. In C2, they indicated that separate rules would be appropriate for separate assets. And in C1F, they specifically indicated that the agencies were to develop appropriate standards for risk retention specifically for the securitization of commercial loans issued here. So that's just an indication that they were actually supposed to find the appropriate level of risk retention for different. Which was the latter section you referred to? C1F. And does that include all CDOs or just CLOs? It's collateralized debt obligations, securities collateralized by collateral debt obligations, and similar instruments. So it's much broader than your issuance. It's much broader than just open market CLOs. That is true. But it's an indication that it's horses for courses. And it uses the word appropriate, which Michigan BEPA tells us requires a cost-benefit analysis for the specific impact. It isn't enough to say simply that the agencies could be indifferent to the amount of risk above a 5% level. And the agencies themselves weren't indifferent to that amount of risk. They indicated that to have an amount of retention above 5% would incur the costs of tying up too much capital and squeezing managers out of the market. And they calculated what – I'm sorry. What is it about CLOs that makes this so burdensome, uniquely burdensome? Why aren't other CDO issuers similarly burdened? Well, most CLO managers play a unique role in the market. They're not in the business of using a balance sheet, investing in holding positions. They're in the business of providing a service to investors under an established business model that's driven by the equity holders or the note holders who establish a set of investment constraints, and the manager then is directed to and rewarded for selecting good loans within those rather than others. So the fact that they are adverse to the origination and not in the business of holding interests is what does separate them from most securitizations. And it certainly separates them from the type of securitization that Congress was most concerned about, where entities with balance sheets who originate loans then use the securitization process to offload those to investors. You are talking about what you think Congress intended, and the government's talking about what it thinks Congress intended. Why do you say that's what Congress was most concerned about? Well, I would note that their legislative history focuses on the originate-to-distribute model. But the language of prong two, particularly prong one, indicates gives the agencies a way to reach all securitizations. And then prong two indicates that not only can you regulate the issuer, you can reach back in the transaction and go after the parties who hold loans and are using the issuer as part of the security transaction. And that's by transferring and selling loans to the issuer. That's the reaching back in the transaction part. Open market CLO managers aren't part of that part of the transaction. They have nothing to do with loan origination. So they have nothing to sell or transfer to the issuing agency. And that's why they're excluded. And prong two then is why an indication of Congress's concern about the parties who hold loans, originate loans, doing the transfer and sale to the issuing entity. And the government mentioned a few times about the borrowing from the prior regulation. Yes, if I could, thank you very much. Congress rejected their view of sponsor in a couple of different ways. They are there. Congress rejected their view. Congress rejected the agency's view that a sponsor somehow covered the universe, that by grafting prong one onto the definition and not just relying upon something that resembled but does not mirror Regulation AB, Congress intended that there be a different mechanism, the regulation of the issuer that would define the scope of what could be regulated. Congress also didn't adopt word-for-word Regulation AB. They changed a crucial part of that. That Regulation AB has language about transferring or selling to an issuing agency. I'm sorry, to the issuing entity. Congress changed that to issuer. That's because Congress wanted to avoid exactly what the agency's arguments are, which is some distinction between issuing entity in prong two and issuer in prong one. In fact, Congress confirmed by making that change that issuer as issuing entity had to be the same in both prongs. Do we have anything, not that it would be especially significant, anything that indicates that some member of Congress actually focused on what you just said and said something about it? I'm sure it's in the midst of some conference room in a congressional building. No, not beyond there being absolutely no basis for anyone to assert that sponsor extended to active managers and the evidence of Congress changing the rule. It's a text-based argument that Congress, which I appreciate, but I just want to make sure there's not something we're missing. This is a text-based argument regarding the statute and the change from the regulation. Your point is that they couldn't have meant, well, they didn't take the regulation as is. They didn't take the regulation as is, and they certainly didn't take it the way the agencies are arguing it now and argued it in their order, which is somehow transferred, and prong two needs to be expanded to cover all securitizations. It didn't function that way before the enactment, and with prong one Congress completely rejected that interpretation. You had a third point. Maybe that was the third point. Yes, the sponsor was the third point. Thank you. There's no loophole. The CLOs can be differentially regulated in. There was no adoption. In fact, there was a rejection of the sponsor notion. Okay. Thank you to both sides for the arguments. The case is submitted.
judges: Kavanaugh, Williams, Ginsburg